Nott, J.,
delivered the opinion of the court:
A statement of the facts which make the record history of this case is i>refixed to this opinion. To some of them we now-advert.
The case came commended to the court by the apparent confidence of the counsel for the government. It was not entitled to go upon the trial docket of April, 1874, the testimony in chief had not closed till February 7; the case had not been put upon the notice book; the claimants’ brief was not yet filed. *611 As the rales of the court then stood, any of these things constituted an objection to a hearing in April, and would have operated, if not waived, to throw the case over the term. (See Rules XI, XXX, C. Cls. Digest.) But on the 3d March leave was granted, with the assent of the government, both to amend the petition and to put the case upon the April docket. On the 23d of March an amended petition was filed, and on the 22d April the case came to trial.
The rules of this court then provided as follows : •
“In cases where a finding of facts by the court is required by the rule of the Supreme Court, either party desiring the same to be made shall, before or at the time of the submission of the cause, file a request that the court make such a finding.
“If neither party file such a request it will be considered that a finding is not desired, and none will be made.” (Rule XXXYII, Digest.)
No request for a finding of facts was filed by either party, and the court was thereby given to understand that the case involved no question of law which could be the subject of review in the Supreme Court. Pursuant to the settled practice of the court in such cases no findings of fact were made.
When the case came to a hearing there appeared to be involved the title to and capture of a great number of distinct-parcels of cotton, which, with the names of the parties from whom purchased and of the Army officers who seized the same,, respectively, were set forth in a tabulated statement in the nature of a bill of particulars forming a part of the petition. Three of these parcels the counsel for the claimants informed the court he should not press, deeming the evidence concerning them insufficient to warrant him in asking for a recovery, or that they had been paid for. These three were:
Cotton from plantation of A. Nezat_,. 20 bales.
Cotton from plantation of Valmont Stelly. 27 bales.
Cotton from plantation of D. Ross. 4 bales.
They aggregated.. 51 bales.
And left as the subject of claim thirty-sis parcels or causes of action, containing in the aggregate precisely 1,800 bales. But the evidence produced extended to some parcels not contained in the tabulated statement, and the claimants’ brief asked judgment for the proceeds of 1,846 bales, aggregating $354,432.
*612 On tbe part of tbe claimants tbe evidence was, as to most of tbe' items, twofold, consisting first of testimony of witnesses, and secondly of vouchers or receipts of officers wbo captured tbe cotton. Twenty-tbree of these receipts were given by one officer. They represented 94=9 bales of cotton, and were in tbe following form:
“Exhibit 1 (Pope). — F. A., U. S. com’r, Sept. 30, 1872.
“ I hereby certify that, in accordance with orders from tbe commanding general Department of tbe Gulf, I have taken for military purposes, from the plantation of Dr. Lee, of tbe parish of Avoyáles, tbe following property, to wit: Forty-two (42) bales of cotton, the property of H. P. Noblom, a subject of Belgium, such cotton having been seized by order of Col. T. E. Chickering, com’d’g 41st Mass. Inf. Eeg’t Vol’s, com’d’t of post at Opelousas, and Lieut. Col. Sargent, provost-marshal, by Capt. F. G. Pope, and delivered to the reg. Q. M?; thence shipped to tbe U. S. Q. M. at New Orleans, Louisiana, before the evacuation of our troops at Opelousas in tbe spring of 1863.
“F. G. POPE,
“ Capt. Oo. F, 41 Beg’t Mass. Yol.
■“April, 1863.”
Concerning these receipts this officer testified as follows, and be also testified to tbe authenticity of a number of similar receipts purporting to be in tbe name of other officers:
“Interrogatory 6. Please look at the receipts now banded you, and made exhibits in this case, numbered on tbe back in red ink from 1 to 28 (with tbe exclusion of numbers 9 and 19). •-■State if those signatures are your genuine signatures, and are of those alluded to in 3'our previous answer. (Papers banded to tbe witness, and put into tbe case, and marked ‘ Exhibits 1 to 26 inclusive,’ with tbe initials of the commissioner and date of hearing.)
“Answer. I have examined all tbe papers banded me, and my signature upon all of them is genuine, and they show correctly tbe amount of cotton for which they were given. I gave receipts to tbe persons on tbe plantations in about this form: 11 have this day taken from so and so, so many bales of cotton, belonging to A. P. Noblom & Company.’ In 1864, while I was sick in New Orleans, those receipts were brought to me, with these receipts which now lie before me. Those receipts which I had given before, not being worded in the proper form, they wished me to sign these receipts, and give them in exchange for the others, and I did so; and these are the receipts ^rhich I gave in exchange for those which I gave on the plantations.
*613 “ Interrogatory 7. Who desired this change of receipts 9 Was it by a military order; and, if so, whose 9
“Answer. It was Mr. Noblom desired them changed. I refused, at first, to do so, but Major-General Banks, commanding the department, sent me a note saying as I had taken the cotton, and the receipts not being properly worded, that I would sign these in their places, and I did so. This note from General Banks was lost on the Bed Biver campaign.
“Interrogatory 8. What became of the receipts originally issued by you, and taken up when you signed the present exhibits herewith filed ?
“Answer. That I couldn’t tell. They were either lost on the Bed Biver campaign, or in the Shenandoah Yalley, on the 19th day of October, 1861, amongst the rest of my papers. I retained them until they were lost.
“Interrogatory 14. Have you ever seen him write, and were you familiar with his handwriting 9 “Answer. I have, a great deal.
“Interrogatory 15. Look at receipt numbered on the back in red ink 31, now handed you, and made an exhibit in this case, and state whether the signature thereto is in the handwriting-of Captain A. B. Long 9 (Paper put in and marked Exhibit 30, with the initials of the commissioner and date of hearing.)
“Answer. I should say that is the handwriting of Captain Long; I am confident that it is his writing.”
Being cross-examined, the witness says as follows:
“ Cross-interrogatory 1. When do you say that these receipts, signed by yourself, were given 9 “Answer. Those were signed in February, 1864.
“ Cross-interrogatory 2. What was done with the receipts which had previously been given 9 “Answer. They were retained by me until lost. “Cross-interrogatory 3. When and where were they lost 9 “Answer. Host all my company books and papers on the Bed Biver campaign; it was some time in May, 1864.
‘£ Cross-interrogat'ory 4. Were those receipts company papers 9 “Answer. No, sir, they were not; but they were with the company papers in the company desk, as it was called.
“ Cross-interrogatory 5. Did you, yourself, compare the old receipts which were surrendered to you, with the new receipts which you gave and which are now produced 9 “Answer. I did, sir; very carefully.
“ Cross-interrogatory 6. In what respects did the new receipts differ from the old 9
‘‘Answer. Only in the form of wording of it; there was the same number of bales and the same plantation, and taken from the same man, only the wording was different.; there was more of it in the new ones.
*614 “ Cross-interrogatory 7. Can you state the form of the receipts which were surrendered ¶
uAnswer. Something like this: ‘I have this day taken for the United States Government so many bales of cotton from such a plantation, said to belong to A. P. Noblom & Company, of New Orleans.
“ Cross-interrogatory 8. For what reason did you object to giving new receipts ?
“ Answer. Being quite sick with the. chills and fever, and having given receipts once, I didn’t feel that I had a right to change them.”
The large experience which this court had then had in the abandoned or captured property cases had'taught its members that the contemporaneous receipts of officers who made the capture, though according to the books inferior to the testimony of witnesses, were much more trustworthy. It cannot now be recalled that these receipts of'officers in any other case were ever found to bo fictitious, and when they corroborated the testimony of witnesses, they, were always regarded as evidence of the most satisfactory kind.
It should also be noted that no oral argument was made by the claimants’ counsel further than the disclaiming" of the three items before mentioned, and that he submitted the case upon his printed brief. (See ante, p. —.)
On the part of the government no testimony of a single witness was produced; no evidence, documentary or otherwise, was offered; no request for findings of fact was made; no brief was filed; and the counsel for the government directed the attention of the court to the following items or causes of action in the tabulated statement as the only ones which were contested:
Bales.
Cotton on plantation of Pierre Pitre. 31
Cotton on plantation of C. Eomero... 7
Cotton on plantation of J. Berin. 37
Cotton on plantation of D. Dejean. 30
Cotton on plantation of E. W. Heath. 8
These items amounted to... 113
Here it may be noted that the court decided in favor of the government (1) as to all the items which were contested; (2) as to 145 bales of an item or parcel which had not been objected to by the counsel for the government, viz, B. Peteten & Co.’s *615 205 bales; (3) as to 46 bales sought to be recovered in the claimants’ brief, but not set forth in the tabulated statement, amounting in all to 304 bales.
Concerning the declared law which prevailed in this court when the case came to trial, there was a circumstance connected with the case which at this distance of time may be overlooked. We say the “declared law which prevailed in this court,” because very grave differences existed'from the first between this and the Supreme Court concerning the purpose and nature of the abandoned or captured property act, and of the principles of law applicable to it, and in the light of which it should be interpreted and administered. (Witkowski’s Case, 7 C. Cls. R., 393, 398).
Among these subjects of difference was that of a suit brought by an executor or administrator, with the resulting question whether the loyalty to be established under the statute was that of the deceased owner, or that of the representative owner, the administrator of the estate. “We were not ignorant that at the ■common law an action.of trespass or trover may be maintained by an administrator in whose name and from whose custody property has been taken, and that the common law regarded him as the technical legal owner j but we were at the same time aware that such actions were merely possessory, while the statute under which we were acting does not award a cause of action to the person in possession of the captured property, or entitled to possession, but, on the contrary, bases such actions on ownership instead of on possession, and couples with ownership an equitable right to the proceeds. Cases, too, arose where a loyal decedent was represented by a disloyal administrator, and it seemed to us abhorrent to the just and equitable intent of the statute to allow the estate of a loyal citizen to be in effect confiscated because of the accident or chance of the administrator’s guilt. Deferring to the analogies of the common law, we thought the closest to be that of an executor under the ban of outlawry, who was allowed, nevertheless, to maintain his action, because in contemplation of law it was to protect the rights of others and not his own.” (Carroll’s Case, 7 C. Cls. R., 589.)
The Supreme Court thought differently. It reversed the judgment, and held that the person having the legal custody of the property at the time of capture was the owner within the meaning of the statute, and that it was his loyalty and not *616 that of the deceased intestate which the statute intended should be established. (Carroll’s Case, 13 Wall. R., 351.)
Accordingly, when the case of a factor in possession, with a lien for advances, came before this court, the principle laid down by the Supreme Court in the then recent case of Carroll was applied to it, and this court said:
“The Supreme Court decided in Carroll’s case that a suit may be maintained under the abandoned or captured property act by one who was not the owner in his own right, but who, at the time of seizure, was possessed of the property under a title upon which he could maintain an action of trover or trespass, and who, at the time of bringing suit, was entitled to receive the proceeds as the trustee or representative of parties not before the court. We perceive no difference in principle between the case of an administrator and of a factor in possession with a lien upon the property for advances made. The factor is entitled to hold the property; he may sell it to repay his advances, or maintain an action of trover or replevin, to the exclusion of any action by his principal, and on recovering its value he becomes a trustee of the original owner to the extent of his residuary interest. It may be doubted whether the original owner not in possession, not entitled to possession, and not primarily entitled to the proceeds, could maintain a suit here under the statute; and it is tolerably certain that he and the factor could not have brought several and conflicting suits' for their" respective interests and compelled this court to settle disputed accounts between them. Therefore it seems tolerably clear that this suit is properly brought by the factor, who, on recovering, will be liable to his principal for the surplus after repaying his own advances, as if this suit were an action of trover brought in a court of common law.” (Villalonga’s Case,. 8 C. Cls. R., 452.)
When the present case of Bellocque, Noblom So Oo. came to trial the decision of this court in the Villalonga Case had been rendered, and its reversal in the Supreme Court (23 Wall. R., 35) had not yet taken place. Hence the variance between the-allegations of the first and last petitions received no attention from the court, it being believed by its members that the claimant was entitled to recover under the decision of the Supreme-Court in Carroll’s Case, upon the allegations of the first petition; and that the new allegations set up in the final petition, which changed Bellocque, Noblom So Co. from factors to purchasers, were merely a precaution of counsel for the purpose of making the pleading conform to facts which had been established by evidence. As the amount involved in this case was- *617 more than three times as great as that involved in the Yilla-longa Case, the court naturally supposed that if the same question existed in this case the counsel for the government would have requested a finding of facts, and would likewise have taken an appeal.
Finally it appeared on the face of the record that Bellocque, Noblom & Co. were not unknown to the officers of the government, one member of the firm having presented in 1863 an enormous claim for 2,580 bales of cotton to the chief quartermaster of the Department of the Gulf, Colonel Holabird, who had investigated the claim, and allowed it to the extent 2,120 bales, and had paid to Noblom thereon $168,582.40. It also appeared that the same member of the firm had been the Belgian consul in New Orleans, and that the firm, at least in the evidence, had been a reputable commercial house, doing a large business there. To these facts may [be added one more, which would have tended to disarm suspicion if any had existed, viz, that the claim was no longer prosecuted by the original claimants on their own behalf, but by a syndic of their estate, appointed by one of the courts of Louisiana, and for the benefit of creditors.
Notwithstanding that the Attorney-General and his assistant counsel had called no single witness, and had produced no documentary evidence to refute the case; and notwithstanding that the counsel for the government filed no request for findings of fact, and professed to contest only a few designated items of those set forth in the petition; and notwithstanding the apparent disinterestedness of the prosecuting claimant, and the apparent respectability of the original claimants and all other persons who appeared to be connected with the case, so soon as the members of the court took up the record for examination a certain suspicion arose, not of fraud but of mistake, which found expression in the~opinion of the court. Ordinarily where no findings were requested by either party, where no point of law was argued, and where no conflict of testimony existed, no opinion whatever would have been delivered. But in this case, for the reason stated therein, an opinion was delivered, viz, to call the attention of counsel to what seemed to the court an extraordinary circumstance, and to suggest to the law officers of the government a possible error in the judgment, and to place clearly before them the fact that all responsibility therefor must *618 rest thereafter with them, and not Avith the court. (See opinion, ante,' p. —.) . '.
No motion for a new trial or to correct the judgment was made by the Attorney-General or his assistants, and in August the judgment was paid.
On the 17th May, 1876, the present Assistant Attorney-General, having been in the meanwhile assigned as law officer of the government in this court, moved to vacate and set aside the judgment on the ground that it was procured by fraud and perjury. The motion was supported by affidavits which made prima facie an overwhelming case. It was allowed and a new trial ordered. On- the new trial no counsel appeared for Bel-locque, Noblom & Go., nor for the surviving syndic, Henry Peychaud, either at the talcing of testimony or on the hearing. The court, for greater precaution, ordered a citation to be personally served upon Peychaud notifying him to appear on a day certain for which the case was specially assigned. The citation was duly served upon him, but he failed to appear. On the motion of the Assistant Attorney-General the court has taken up the evidence and has proceeded to find the facts relating to the alleged frauds.
In view of the facts that none of the persons implicated have been heard at the bar, that the witnesses to establish the fraud were not subjected to cross-examination, that a strong feeling evidently exists between some of the parties to the transactions involved in the issues of the case, that the present claimant is absent, and that no one of his counsel has volunteered to-defend his rights or shield his character, the court has felt it to be its duty to scrutinize with unusual care the new evidence offered by the government and to reject all that is not clearly admissible. In view of the facts before mentioned, the court does not feel at liberty to spread the circumstances needlessly upon the record, nor to name the parties implicated, nor to characterize the transactions as they probably would be characterized if they had been defended. Suffice it to say that the evidence forces the court to the conclusions which are expressed in its findings of fact.
In this connection, however, it is proper to say that the court desires to note the fact specifically in its opinion, that there is no evidence connecting either Madame Odile Derbes.Bellocque or Mr. Boy with the frauds that 1 aint the case, and it is the *619 opinion of the court that whatever fraud, was committed in the inception or prosecution of the claim in the name of Bellocque, Noblom & Co. was exclusively the act of the remaining partner, August P. Noblom.
This is the first case in this court wherein it is established that a claimant by fraud and perjury has succeeded in getting-money from the Treasury. There has been a great multitude of cases brought here since the court was reconstituted in 1863. Some of them have been smirched with the demoralization of the war; in a few fraud has been attempted, but has fallen short of success; in many, even for large amounts, the defense of the government has been confided (in times happily gone by)' to inexperienced or incapable or treacherous hands,* yet the general result establishes the fact that in courts of justice the chances are overpoweringly against the actual success of a fraudulent claim; that sooner or later it will be uncovered, and that ultimately it will be unsuccessful. Furthermore, whatever fraud was devised by Bellocque, Noblom & Co. was not intended for this court, but was designed áb mitio to be perpetrated upon the government through the Department of State. The claim was prepared for that department; it was first filed there (upon the ground that the parties were foreigners) and this action was not brought until the very last day of the jurisdictional period for seeking relief under the abandoned or captured property act, and was not prosecuted until all hope that such claims would be taken up in the Department of State had vanished.
Furthermore, it is noticeable that the grosser perjury which vitiates the case was procured and perpetrated after the claim had passed from the hands of the original claimants, and while it was being prosecuted for the benefit of their creditors by a comparatively disinterested party. Finally, it is a significant fact that the fraudulent schemes to elude the decision of the Supreme Court in Lapene & Ferre (17 Wall. R., 601, Nov. 24, 1873) were concocted, and the perjury to support them was suborned, and the conspiracy to carry them into effect was planned, not by Bellocque, Noblom & Co., who brought the *620 suit, nor by Henry Peychaud, the syndic, who prosecuted it, but by adventurers who were prosecuting the claim under a so-called contract with the syndic for shares of what might be recovered, and whose unscrupulous conduct and unprecedented success seem to vindicate the severity of the common law in prohibiting and punishing champerty.
The judgment of the court is that the firm of Bellocque, No-blom & Co., consisting of Odile Derbes Bellocque, August P. Noblom, and Pierre Boy, or the surviving partners or partner thereof, the original claimants who instituted and brought this suit, and the said August P. Noblom individually, and Henry Peychaud, the surviving syndic of the estate of Bel-locque, Noblom & Go., the present claimant herein, and who prosecuted this suit to judgment, be, and they hereby are, each and all of them, adjudged to have corruptly attempted and practiced fraud against the defendants, the United States, in the proof, statement, establishment, and allowance of the claim in this action; and the court finds specifically that the judgment rendered in this court on 18th May, 1874, in favor of the said Henry Peychaud, syndic as aforesaid, for the sum of $296,064, was procured by the fraud and corrupt practices of the said firm, and of the said Noblom, and of the said Peychaud in the proof and statement which they procured and used in the prosecution of this suit, with the corrupt intent to deceive the court and to defraud and wrong the defendants, to wit, as is more specifically set forth in the findings of this court filed the 31st day of May, 1881, and forming a part of this judgment; and it is further adjudged that the claim in this suit set forth and fully and at large described in the petition and amended petitions of the said claimants be, and hereby is, forfeited to the government, to wit, the said defendants, the United States; and that the claimants, and each and all of them, be forever barred from £>rosecuting the same.

In this connection it is proper to state explicitly tire fact that no person now attached to the Attorney-General’s Office had charge of the defense of cotton cases at the time above referred to or is in any way alluded to in the opinion.